**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE No. 1:26-MD-03193-KMM**

In re:

HEALTH GORILLA, INC., ET AL.,

DATA SECURITY BREACH LITIGATION

---

THIS DOCUMENT RELATES TO:

PATTERSON v. UVA HEALTH, ET AL., F.L. No. 1:26-cv-25670-KMM

BERRY v. EPIC SYSTEMS CORPORATION, ET AL., F.L. No. 1:26-cv-25674-KMM

---

# EPIC SYSTEMS CORPORATION'S PRELIMINARY REPORT

Defendant Epic Systems Corporation ("Epic") submits this Preliminary Report in accordance with this Court's Order Setting Initial Conference. (Doc. 20.)

## I. Epic's Preliminary Understanding of the Facts.[1]

### A. The Interoperability Frameworks.

Healthcare organizations need to share patient records with each other to provide the best care for patients that visit more than one healthcare system. One of the most common methods for sharing those records securely is through interoperability networks designed for that purpose. Two such national interoperability networks are Carequality and the Trusted Exchange Framework and Common Agreement ("TEFCA"). For example, when a patient on vacation arrives at an emergency department on the other side of the country from their primary care provider, a simple pull from a national interoperability network can provide the care team with the background on the patient needed to allow them to make informed care decisions. Together these frameworks handle more than a billion record exchanges each month. Used properly, these networks improve the quality of care and patient outcomes.

These are trust-based exchanges. In order to function efficiently and effectively, participating healthcare organizations set up automated processes to provide designated data types in response to pre-approved request types. For these networks, the approved request type is for treatment purposes.[2] Thus, a requesting organization is trusted to only make record requests for treatment purposes through these networks and, based on that trust, a responding organization can automate the response, which allows the exchange (response and request) to happen within

[1] Unless otherwise noted, the facts described below reflect Epic's current understanding based on publicly available information and information presently available from the ongoing litigation proceedings.

[2] Under HIPAA (Health Insurance Portability and Accountability Act), healthcare providers, as custodians of patient records, are permitted to share different amounts and types of patient records depending on the purpose for which it is being requested. For example, the level of disclosure allowed for a treatment purpose is different than what is allowed for payment or healthcare operations.

seconds.

Access to these networks is controlled by companies called “implementers,” which connect or “onboard” the organizations seeking access. Epic is an implementer and a founding member of Carequality. Epic also operates as a Qualified Health Information Network (“QHIN”) under TEFCA. Health Gorilla, Inc. is another implementer on Carequality that also operates as a QHIN under TEFCA. As a designated gatekeeper, Health Gorilla was responsible for onboarding connections and checking that they were eligible to assert a treatment purpose at all.

**B. The Conduct That Gave Rise to These Actions.**

Epic’s understanding is that Health Gorilla onboarded an interconnected web of entities and allowed them to request medical records under the false pretense that they were treating patients. The conduct involved four steps. First, individuals set up closely held entities that resembled treatment providers, with clinical-sounding names, nonfunctional treatment websites, and purported clinician owners, in order to gain access to the frameworks. Second, those entities queried patient records while asserting a treatment purpose. Next, the individuals then sold the records through a second closely held entity to buyers such as law firms seeking claimants for mass tort suits. Finally, when one entity was identified as a bad actor, a new one was created in its place.

When Epic identified and investigated irregularities in data exchanges between its healthcare provider customers and Health Gorilla’s participants, including entities called Mammoth, RavillaMed, and Unit 387, Epic raised its concerns with Health Gorilla and Carequality. Health Gorilla averred that it had investigated, found nothing wrong, and asserted that it would allow its participants to continue to make requests on the interoperability frameworks.

Accordingly, on January 13, 2026, Epic, OCHIN, Inc., Reid Hospital & Health Care

Services, Inc., Trinity Health Corporation, and UMass Memorial Health Care, Inc. sued 16 defendants in the Central District of California in *Epic Systems Corp., et al. v. Health Gorilla, Inc., et al.*, No. 2:26-cv-00321 (C.D. Cal.) (the "Fraud Action").[3]

### C. The Data Breach Class Actions Before This Court.

The putative class actions in this MDL were filed after the Fraud Action. Almost all of them rely on the Fraud Action's allegations to describe some of the underlying events. Each is a proposed nationwide class action brought by individual patients whose records were allegedly requested and obtained by Health Gorilla's customers under false pretenses. They plead claims such as negligence, breach of implied contract, unjust enrichment, and invasion of privacy, and they seek money damages together with injunctions requiring specific security measures and disclosures. Epic was named as a defendant in the pending *Patterson*, *Fox*, and *Berry* actions. On July 31, 2026, the *Fox* plaintiffs filed a notice of dismissal under Rule 41(a)(1), and Epic was terminated as a party that same day. The *Fox* case remains pending only as to Health Gorilla. Epic remains a defendant in only two cases: *Patterson* and *Berry*, where plaintiffs claim Epic did not do enough to keep improper requests off its record-exchange network. Epic disputes those claims and reserves all defenses.

## II. Epic's Assessment of Preliminary Factual Issues Relating to the Data Breach Class Actions.

The factual issues in this collection of data breach class actions revolve largely around three categories.

[3] While the JPML issued a conditional transfer order for the Fraud Action to be included in this MDL, Judge Fernando M. Olguin, who has been overseeing the Fraud Action, had previously entered an order concluding that the Fraud Action is not "closely related" to, and could not be consolidated with a separate data breach class action being pursued against Epic. *Patterson v. UVA Health*, No. 1:26-cv-25670-KMM, Doc. 9 (S.D. Fla. Aug. 18, 2026) (order denying transfer). On that basis, and for other grounds stated in its filing with the JPML, Epic maintains that the Fraud Action is not itself a data security breach case and does not belong in this MDL, and moved to vacate the conditional transfer order that would bring it into this proceeding. *In re Health Gorilla, Inc., et al., Data Security Breach Litig.*, MDL No. 3193, Doc. 61 (J.P.M.L.).

First, these actions center on fact questions unique to each plaintiff regarding: (1) whether a particular patient's data was actually accessed, viewed, copied, or exfiltrated; (2) what categories of information were involved, ranging from basic identifying information to Social Security numbers, financial account information, or sensitive medical records; (3) what injuries under the law, if any, the individual patient actually suffered; (4) causation of any alleged harm; and (5) whether any individual patient accepted a governing arbitration agreement with their healthcare providers or others. These questions of fact specific to individual patient records, injury, and causation lie at the heart of each putative class action.

Second, the factual record will show that Epic, Trinity, the University of Illinois Hospital & Health Sciences System, and The Rector and Visitors of the University of Virginia took appropriate steps to secure the data in question and to guard against improper requests. Even so, if the data security breach action plaintiffs survive a motion to dismiss, the plaintiffs in those cases have raised fact questions related to whether Epic and the healthcare providers implemented reasonable data safeguards and complied with applicable privacy and security obligations, including questions regarding: (1) the design and administration of the platforms through which patient information was shared; (2) the security controls in place; (3) the adequacy of vendor oversight; (4) the timing and content of breach notifications; and (5) the accuracy of data security representations.

Third, there will be issues relating to whether Health Gorilla, and those working with Health Gorilla, knew its customers wanted records for impermissible purposes, whether and when Health Gorilla knew of its customers' impermissible purpose in querying records, to whom and how the records were transmitted, and whether those customers in fact took records for impermissible purposes.

Other factual questions relate to the structure of the alleged access itself, since the record requests came through different entities, at different times, and under different framework connections rather than through a single intrusion into one system.

## III. Epic's Assessment of Critical Legal Issues.

Epic anticipates that several threshold issues will be central to these proceedings, including: (1) whether each named plaintiff has Article III standing (for example, because their data was never accessed by Health Gorilla); (2) whether personal jurisdiction exists over Epic; and (3) whether the complaints state a viable claim for relief against Epic.

Epic further anticipates that liability and damages issues will include, among other issues: (1) whether Epic owed any legally cognizable duty to the named plaintiffs or putative class members; (2) whether any alleged disclosure caused injury-in-fact or compensable damages to the named plaintiffs or putative class members; and (3) whether plaintiffs can establish causation as to Epic.

Finally, Epic anticipates that class certification issues will include: (1) whether claims against defendants with materially different roles in the healthcare record-exchange ecosystem can be adjudicated on a class-wide basis; (2) whether common issues predominate where records were allegedly requested by different entities, through different framework connections, and at different times; and (3) whether a nationwide class can be certified consistent with Rule 23 and applicable state law variations.

## IV. Conclusion

Epic submits this report pursuant to the Court's Order Setting Initial Conference. Consistent with that Order, the positions set forth herein are preliminary and non-binding and are made without waiver of any claims, defenses, objections, or jurisdictional arguments.

Dated: September 14, 2026

Respectfully submitted,

/s/ Charles Throckmorton
FOLEY & LARDNER LLP
Charles Throckmorton (FBN 101203)
charles.throckmorton@foley.com
200 South Biscayne Boulevard, Suite 2100
Miami, FL 33131
Telephone: (305)482-8400

Michael D. Leffel
Eric J. Hatchell
FOLEY & LARDNER LLP
150 E. Gilman Street, Suite 5000
Madison, WI 53703
mleffel@foley.com
ehatchell@foley.com

*Attorneys for Defendant, Epic Systems Corporation.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 14, 2026 I electronically filed the foregoing document using the CM/ECF System which will send notification of such filing to all counsel of record.

*/s/ Charles Throckmorton*